UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
         )
   v.      ) CRIMINAL NO. 04-10317-RCL
         )
ANDREW LEWIS

MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
<u>MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE</u>

**<u>RELEVANT FACTS</u>**

A. FEBRUARY 8, 2003 SEIZURE OF DEFENDANT'S GATEWAY PERSONAL
<u>COMPUTER AND LAW ENFORCEMENT INTERROGATION</u>.

At the time of the alleged offenses, Mr. Lewis was employed by the National Park Service and had been so employed for 16 years.  As of early 2003, he was assigned to the Salem Maritime National Historic Site ("SAMA") as a Law Enforcement Park Ranger and, along with one other law enforcement ranger, occupied an office in the basement of a building on the site.  In late 2002 or early 2003, he replaced his home Gateway personal computer with a Macintosh E-mac and brought the Gateway computer into work because he intended to use it as a replacement for the government-supplied desktop computer, which was quite ancient and dilapidated.  He was told by a superior, however, that he could not substitute a personal computer for one owned by SAMA.  Upon learning this, he placed the Gateway computer in a large green container and set it aside in the basement with a note declaring "Personal Property - Do Not Touch."

The computer remained in the basement for approximately one week.  On February 6, 2003, another National Park Service employee, Randall Becker, retrieved the computer, turned it on, and, according to him, began looking at "interesting file names." Becker started looking through the interesting files and discovered pornographic images, some of which appeared to be of young males.  He continued to check file names and associated pictures and eventually discovered a picture of Mr. Lewis, whom he knew.  After discussing his discovery with a co-worker, Becker the next day notified his superior of his find.

Becker's superior, Park Supervisor Elizabeth Marcus, asked Becker to find out which government computer the material was on. Becker then discovered that the computer at issue was not a government computer at all.  Not withstanding Becker's revelation, U.S. Park Ranger Christopher O'Shea traveled to SAMA from his station in Charlestown and seized the Gateway.  O'Shea brought the computer to the Boston National Historic Park in Charlestown, where he and Special Agent Glenn Van Neill began looking through the contents of the computer.  O'Shea and Van Neill discovered sexually explicit adult pornography.  According to Van Neill, some of the pictures "appeared to be" of younger males of an unknown age.  They also discovered pictures of Mr. Lewis, whom Van Neill knew and had worked with at various sites over the several years the two had worked together.

-2-

On February 8, 2003, the day after searching through Mr. Lewis's computer, O'Shea and Van Neill traveled to SAMA to meet with Mr. Lewis while Mr. Lewis was working. Mr. Lewis was relieved of his regular duties for the day so that O'Shea and Van Neill could interview him at one of the administration buildings on the site. Mr. Lewis believed he had to cooperate with Van Neill because, <u>inter alia</u>, of the workplace nature of the interrogation.

During the course of the interview, Mr. Lewis explained how his home computer had come to be at the site and questioned why Van Neill was interested in his personal property. Van Neill told him that it was none of his business. Mr. Lewis admitted that there was adult pornography on the computer and that he only viewed photographs from websites that contained the disclaimer that all persons were over 18 years of age. He also denied using his government-supplied work computer to visit or download pornography or other inappropriate material. Van Neill informed Mr. Lewis that he was going to check Mr. Lewis's government computer for inappropriate images. According to Van Neill, Mr. Lewis also orally assented to a re-search of the Gateway computer.

Van Neill ordered Mr. Lewis to turn over his badge and gun, and told him that he was suspended and would be on administrative leave. A month later, Mr. Lewis received a letter from the

Superintendent of SAMA stating that a criminal probe of him had ended and that he could return to work.  The letter suggested that some administrative action might be taken in the future.

B.    SUBSEQUENT ATTEMPTS TO EXAMINE DEFENDANT'S GOVERNMENT-
      ASSIGNED COMPUTER, THE JUNE 27, 2003 INTERROGATION OF
      DEFENDANT, AND EXAMINATION OF DEFENDANT'S GATEWAY COMPUTER.

Two months after Mr. Lewis received the letter indicating the criminal probe had concluded, Van Neill removed the hard drives from Lewis's government computer for analysis by a specialist at the U.S. Department of the Interior.  The drives, however, were damaged in shipping and could not be examined.

Undeterred, Van Neill returned to SAMA a month later to re-interview Mr. Lewis, again at his workplace.  By this time, Mr. Lewis had resigned his commission as a Law Enforcement Park Ranger and was working instead as Interpretation Ranger.  He was told to go over to one of the administration buildings to meet with Van Neill and another agent.

Van Neill told Mr. Lewis that he had to talk to him.  Mr. Lewis believed that this was in regard to the administrative action that the letter had mentioned.  Knowing that Van Neill had the power to suspend him, Mr. Lewis understood that failure to cooperate with him would result in significant employment consequences.

Van Neill reviewed the Department of Interior policies on internet and computer use.  Mr. Lewis reiterated that he had not

-4-

used any government computer to view or download pornography. Notwithstanding the fact that he had already tried (and failed) to examine Mr. Lewis's government computer, Van Neill informed him that there was no right to privacy in workplace computers so they would look to see what was on any computer he used.

Van Neill also continued to question him about the Gateway computer that Mr. Lewis had brought from home. Mr. Lewis again told him that it was personal property that he had brought from home, that he considered it personal property even at work, and that this was why he had put the note on it. Van Neill told Mr. Lewis that it didn't matter whether Mr. Lewis considered it personal property, that they had already seized and looked through it, and that they wanted to continue to search it.

Van Neill asked for Mr. Lewis's written consent to this re-search. Mr. Lewis believed that consent was just a formality as Van Neill had already taken the computer, looked through it, and told Mr. Lewis that there was no right to privacy in work computers. Indeed, the written consent, which was produced for Mr. Lewis's signature by agent Khela Vazquez, acknowledged as much when it specified that Mr. Lewis would "consent to the search of my personal computer which is a Gateway which is in the custody of SA Glen Van Neil [sic]."

C.    FEBRUARY 12, 2004 SEIZURE OF DEFENDANT'S MACINTOSH E-MAC
      COMPUTER FROM HIS HOME AND SUBSEQUENT STATEMENTS BY
      DEFENDANT.

Mr. Lewis did not speak to or hear from Van Neill or any
other agent for several months.  Then, on February 12, 2004, Van
Neill again came to Mr. Lewis's workplace at SAMA, where he was
still working at an Interpretive Park Ranger.  Van Neill directed
Mr. Lewis to go over to the protection office located in one of
the administration buildings to meet with him once more.

Mr. Lewis was again placed in the small protection office
where his ability to leave was restricted.  Van Neill told him
that he wanted to look at Mr. Lewis's home computer and asked him
to consent.  Mr. Lewis felt he had no choice but to take Van
Neill to his home given that Van Neill had the authority to
suspend or terminate him from his job.  Van Neill, accompanied by
a Massachusetts State Trooper, drove Mr. Lewis to his home.

Once at the home, Van Neill engaged Mr. Lewis in small talk
with Mr. Lewis while the Massachusetts State Trooper, Thomas
Neff, examined Mr. Lewis's computer.  Neff viewed pornography
that included, according to Neff, two images that "in his
opinion" appeared to be of minors.  In addition to the
pornography, Neff saw files titled "lolitta [sic]" and "pre-
teen."  The labeled files were inaccessible to Neff.  In response
to these observations, Neff announced to Mr. Lewis that he was
seizing the computer.  After Van Neill and Neff seized the

-6-

computer and left Mr. Lewis's home, the agents and Mr. Lewis
returned to Van Neill's government car where Van Neill directed
Mr. Lewis to sign a written consent to the search of his home
that had already taken place.

Mr. Lewis finished his shift that day at SAMA.  Three days
later, Mr. Lewis called Van Neill and requested to meet with him.
Van Neill and another agent, Khela Vazquez, traveled to SAMA to
meet with Mr. Lewis on February 16, 2004.  The interview took
place at the Administrative Office.  At the conclusion of the
interview, Vazquez typed a statement for Mr. Lewis to sign.
Vazquez typed the statement on a form that included boilerplate
language that the statement was voluntary.  In addition, Vazquez
included a specific advisory that Mr. Lewis was not obligated to
make a statement.  In the statement, Mr. Lewis made inculpatory
admissions that he had viewed and downloaded child pornography
onto both his new and old computer.

D.    APPLICATION FOR, AND SUBSEQUENT SEARCH PURSUANT TO, A MARCH
      11, 2004 SEARCH WARRANT ALLOWING EXAMINATION OF DEFENDANT'S
      E-MAC COMPUTER.

The agents retained the E-mac computer seized from Mr. Lewis
for about one month.  On March 11, 2004, Agent Vazquez applied to
Magistrate Judge Judith G. Dein for a search warrant authorizing
agents to search for and seize

        images of children engaging in sexually explicit
        conduct, as defined in 18 U.S.C. section 2256, and

-7-

files and data related to the knowing receipt and/or possession, in interstate commerce, of such images.

See Application and Affidavit for Search Warrant in Case No. 04-M=1025-JGD (attached hereto as Exhibit A).  In summary, the affidavit set forth as its basis for probable cause the following:

- the circumstances surrounding the discovery, seizure and examination of Mr. Lewis's Gateway computer in 2003;

- the agents' subsequent February and June 2003 interrogations of Mr. Lewis concerning the content of the Gateway computer;

- the results of a forensic examination of the Gateway computer;

- the circumstances of the seizure of Mr. Lewis's E-mac computer from his home on February 12, 2004, including observations made by the Massachusetts State Trooper during his "manual search" while at Mr. Lewis's home;

- Mr. Lewis's February 16, 2004[1] statement to the agents after the seizure of the E-mac.

See Id., ¶¶ 7-21.  The search warrant affidavit went on to contend that the computer would have to be examined by a

---

[1] ¶ 21 of the search warrant application erroneously dates the statement as taking place on February 16, 2003.

qualified computer specialist in a controlled laboratory setting. See Id., ¶ 24. Although the application suggested that the analysis "may entail several different techniques," nowhere did the application set forth the process by which the computer specialist would target and limit the search to evidence of violations of child pornography statutes.

Magistrate Judge Dein, in the course of reviewing the affidavit, personally reviewed "the images described in the affidavit attached hereto." See Id. She made no finding that the images depicted were real children (as opposed to computer generated or otherwise altered images) or that the images were from children rather than adults.[2]

Magistrate Dein issued the Search Warrant on March 11, 2004. A copy of the Search Warrant is attached hereto as Exhibit B. The warrant specified that the agents were to search the computer by March 21, 2004, ten (10) days after the issuance of the warrant. Discovery provided by the government reveals that on the same day, March 11, 2004, agents shipped Mr. Lewis's E-mac to Information Technology Specialists in the Office of Inspector General, U.S. Department of the Interior in Denver, Colorado for analysis. Discovery also reveals that while a "preliminary"

---

[2]Review of the Gateway images reveals that a portion of the pictures depict anatomy rather than full portraits, thus complicating the determination of whether the pornography was of prohibited child (rather than protected adult) pornography.

analysis was performed by March 16, 2004, the substantial portion of the analysis was not begun until April, 2004 and not completed until September 10, 2004, nearly six months after the expiration of the search warrant.

E.  MARCH 24, 2004 INTERVIEW OF DEFENDANT

Over a month after seizing Mr. Lewis's E-mac computer from his home, agents re-interviewed Mr. Lewis at work and he orally reaffirmed his earlier inculpatory statements.

**ARGUMENT**

I.  THE SEIZURE AND SUBSEQUENT SEARCHES OF DEFENDANT'S GATEWAY COMPUTER WERE UNLAWFUL.

The Gateway computer and its contents were items in which Mr. Lewis had a reasonable expectation of privacy.  Because the agents had neither a warrant nor a Mr. Lewis's consent to seize the Gateway computer, remove it to Charlestown, and search it on February 7, 2003, the seizure and initial search by the agents are thus per se unreasonable under the Fourth Amendment.  See Id.

A government employee enjoys a reasonable expectation of privacy in his workplace.  See id. at O'Connor v. Ortega, 480 U.S. 709, 717 (1987)(O'Connor, J., plurality opinion).  Courts evaluating public employees' reasonable expectation of privacy in the wake of O'Connor have considered the following factors: whether the work area in question is assigned solely to the employee; whether others have access to the space; whether the

nature of the employment requires a close working relationship with others; whether office regulations place employees on notice that certain areas are subject to search; and whether the property searched is public or private.  See Vega-Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 179-80 (1st Cir. 1997) (summarizing cases).  A search violates a public employee's reasonable expectation of privacy when the employee had no reason to expect that others would access the space searched.  See O'Connor, 480 U.S. at 718-19 (plurality) (holding that physician at state hospital retained expectation of privacy in his desk and file cabinets where there was no evidence that other employees could enter his office and access its contents); Rossi v. Town of Pelham, 35 F. Supp. 2d. 58, 63-64 (D.N.H. 1997)(holding that town clerk enjoyed reasonable expectation of privacy in 8' x 8' office that the public could not access and other town employees did not enter).

Here, agents knew from the very inception of their investigation that the computer belonged to Mr. Lewis.  He enjoyed a reasonable expectation or privacy in the computer itself and certainly in the information contained in the hard drive.  This expectation prohibited the unlawful seizure of the Gateway and the agents' subsequent actions in searching the contents of the computer.  Consequently, the fruits of this unlawful seizure must be suppressed.

Nor can the seizure and search be saved by the agents' assertion that Mr. Lewis orally and, four months later, in writing consented to the search.  Although consensual searches are an exception to the Fourth Amendment's warrant requirement, Florida v. Jimeno, 500 U.S. 248, 251 (1991), the government has the burden of showing that the challenged police conduct in obtaining the consent was lawful.  United States v. Melendez, 301 F.3d 27 (1st Cir. 2002).  To meet its burden, the prosecution must show by a preponderance of the evidence that any alleged consent was knowing, intelligent, and voluntarily given.  Bumper v. North Carolina, 391 U.S. 543, 548 (1968); Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); United States v. Perez-Montanez, 202 F.2d 434, 438 (1st Cir. 2000).

Here, any consent acquired from Mr. Lewis was obtained after agents had already seized the Gateway, transported it away from SAMA, and extensively searched the hard drive themselves.  "For consent given after an illegal seizure to be valid, the government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure."  United States v. Santa, 236 F.3d 662, 676 (5th Cir. 2000).  As to the Gateway computer, the government cannot meet either of these requirements.

First, the consent was not voluntary.  The standard for measuring consent is "objective reasonableness"; what would the

typical reasonable person have understood by the exchange between the officer and the suspect?  Florida v. Jimeno, supra; United States v. Donlin, 982 F.2d 31, 33 (1st Cir. 1992).  Whether consent is coerced or voluntary is a question of fact, to be determined after evaluating the totality of the circumstances. United States v. Twomey, 884 F.2d 46, 51 (1st Cir. 1989).  The fact-finder must look beyond the language of consent to the context of the situation, including the actions and statements of the police.  United States v. Turner, 169 F.3d 84, 87 (1st Cir. 1999).  When deciding whether a suspect's consent to search was voluntary, courts have found factors such as whether the suspect was advised of his rights, or whether consent was obtained under inherently coercive circumstances to be pertinent.  United States v. Forbes, 181 F.3d 1, 5 (1st Cir. 1999), citing United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993) (voluntariness turns on factors including age, education, experience, intelligence, and knowledge of right to withhold consent); United States v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999)(court can consider whether subject was advised of constitutional rights and whether permission to search obtained under inherently coercive circumstances).

Here, Mr. Lewis was approached in a work setting by an investigator he knew and was interrogated about the use of computers in his workplace.  He was not advised of his rights.

He knew that failure to cooperate could and would have adverse impact on his employment. In these coercive circumstances, any consent cannot have been anything but involuntary.

Second, the consent given was a direct product of the illegal seizure and search. When agents interviewed Mr. Lewis on February 8, 2003, they made clear to him that they had already examined the computer and found what they believed to be contraband. The agents made no offer to return the computer once it became abundantly clear that the computer belonged to Mr. Lewis. Rather, the agents continued to hold the computer, doing nothing with it for another four months before returning to interrogate Mr. Lewis and obtain his written consent.[3] And that written consent explicitly acknowledged that it was in regard to the Gateway already "in the custody of SA Glen Van Neil [sic]" as a result of the illegal seizure and previous search. See Santa, 236 F.3d at 677 (consent is product of illegal seizure where there is no break in causal chain).

In these circumstances, the government cannot prove either the voluntariness of the consent or that the consent was not a product of the illegal seizure. Consequently, the evidence must be suppressed. Santa, 236 F.3d at 676.

---

[3]Notably, despite having the Gateway computer in their exclusive control for four months after seizing it, agents made no attempt to secure a search warrant to analyze its contents.

-14-

II.  DEFENDANT'S STATEMENTS OF FEBRUARY 8, 2003, JUNE 27, 2003
     AND FEBRUARY 12, 2004 WERE FRUITS OF THE PRIOR ILLEGAL
     SEARCH AND IN ANY EVENT WERE NOT VOLUNTARY.

     In each of the three interrogations of Mr. Lewis following
the seizure and search of the Gateway computer, agents used the
information gained through the prior illegal acts in order to
extract admissions from Mr. Lewis.  Consequently, any admissions
made were the "fruit of the poisonous tree" and must be
suppressed.  Wong Sun v. United States, 371 U.S. 471 (1963).

     In any event, none of the admissions made by Mr. Lewis were
the product of a free and voluntary act on his part.  "The
voluntariness of an admission depends on 'whether the will of the
defendant [was] overborne so that the statement was not his free
and voluntary act, and that question [is] to be resolved in light
of the totality of the circumstances." United States v. Jackson,
918 F.2d 236, 241 (1st Cir. 1990), quoting Bryant v. Vose, 785
F.2d 364, 367-68.  The burden is on the government to prove
voluntariness by a preponderance of the evidence.  Jackson, 918
F.2d at 241.  Central to the voluntariness analysis is where
there was "police overreaching."  Colorado v. Connelly, 479 U.S.
157, 170 (1986).  A confession extracted by overbearing a
suspect's will through threats, violence, direct or implied
promises, or the exertion of improper influences is not
voluntary.  Jackson, 918 F.2d at 241-242.

-15-

Here, Mr. Lewis was repeatedly approached in a work setting by an investigator he knew and was interrogated about the use of computers in his workplace.  He was not advised of his rights. He knew that failure to cooperate could and would have adverse impact on his employment; indeed, after the first interrogation the investigator immediately suspended him from duty and demanded that he turn over his gun, badge, and other work-related items. In these coercive circumstances, any consent cannot have been anything but involuntary.

The fact that this case does not present the type of "gross abuses," such as beatings, that have resulted in finding confessions to be involuntary does not render the statements admissible.  See Mincey v. Arizona, 437 U.S. 385, 401 (1978).

In the totality of the circumstances, any admissions made by Mr. Lewis under these coercive conditions cannot have been anything but involuntary.  The admissions must therefore be suppressed.

III. THE FEBRUARY 12, 2004 SEARCH OF DEFENDANT'S E-MAC COMPUTER AT HIS HOME AND THE SUBSEQUENT SEIZURE OF THE COMPUTER FROM HIS HOME WAS UNLAWFUL.

    a.   Any Consent to Allow Agents Into Mr. Lewis's Home Was the Fruit of the Prior Unlawful Actions.

By February 12, 2004, agents had illegally seized Mr. Lewis's Gateway computer, had illegally manually searched it to gain evidence with which they extracted limited admissions from

Mr. Lewis, had extensively analyzed it.  In each of the three interrogations of Mr. Lewis following the seizure and search of the Gateway computer, agents used the information gained through the prior illegal acts in order to extract admissions from Mr. Lewis.  Use of the prior illegally obtained evidence came to a culmination when agents confronted Mr. Lewis with the results of their investigation and insisted that he take them to his home so they could examine his Macintosh E-mac. In these circumstances, any consent given to do so represents the "fruit of the poisonous tree" that itself was illegally obtained.  Wong Sun, supra; Santa, supra.

      b.    Mr. Lewis's Alleged Oral Consent to Look at His Computer at His Residence Did Not Permit the Agents' Later Extensive Search of Computer Files Within the E-mac.

A consensual search may not exceed the scope of the consent given, United States v. Turner, supra at 87, and the burden is on the government to prove that the search was within the scope of the consent.  United States v. Schaefer, 87 F.3d 562, 569 (1st Cir. 1996); United States v. Cruz Jimenez, 894 F.2d 16 (1st Cir. 1990).

Even assuming, arguendo, that Mr. Lewis's initial consent to search his home was commensurate with the after-acquired consent form he was made to sign after the computer had been seized, that consent only authorized a limited search of his computer while in

his presence and in no event authorized the seizure of the E-mac. Notwithstanding this limited and strictly circumscribed consent, while at the home one agent engaged in an extensive manual search of the computer while the other denied him access to the room where the search was taking place. Consequently, the search and subsequent seizure of the E-mac far exceeded the scope of the consent given. Because both the search and seizure of the E-mac computer were unlawful, the observations made and the evidence later extracted from the computer must be suppressed.

     c.   The After-Acquired Consent to Search Was Involuntary and the Fruit of the Illegal Seizure.

By their own admission, the agents did not receive written consent for the search they had just conducted until after seizing Mr. Lewis's E-mac computer. As in the case of the Gateway computer, "[f]or consent given after an illegal seizure to be valid, the government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure." Santa, supra, 236 at 676.

Here, the consent given was manifestly a direct product of the illegal search and seizure. The consent was obtained immediately after one agent suggested that he should already have been arrested, had declared that there was probable cause to seize the computer, and had just loaded the computer into the vehicle to take it away for further examination. In these

circumstances, any consent by Mr. Lewis was inherently coerced.
See Santa, 236 F.3d at 677 (consent is product of illegal seizure
where there is no break in causal chain).

> d.   The Agents Did Not Have Probable Cause to Seize the
>      Computer.

Even assuming, arguendo, Mr. Lewis's consent to search the
computer at his home in his presence authorized the manual search
conducted there, that manual search did not itself produce
probable cause to seize the E-mac.  According to discovery, the
seizure was based upon Massachusetts State Trooper Thomas Neff's
"opinion" that a woman depicted in a series of pictures (at least
some of which were apparently not lascivious as prohibited under
the statute) was under the age of 18, and that a man appearing in
a masturbation scene of a movie was similarly under 18.

In order to be subject seizure, images must meet the test of
criminally prohibited, rather than constitutionally-protected, of
child sexual explicitness.  In United States v. Brunette, 256
F.3d 14 (1st Cir. 2001), a law enforcement agent's averment in a
search warrant affidavit that the target possessed images that
appeared to depict a "prepubescent boy lasciviously displaying
his genitals" was not sufficient to establish probable cause to
believe the materials were child pornography.  Id. at 17.  See
Marcus v. Search Warrant, 367 U.S. 717 (1961)(mere conclusory
assertions of a single police officer do not comply with the

First Amendment to protect otherwise constitutionally permissible speech).

Here, Trooper Neff's "opinions" as to age and lasciviousness - thus rendering the images prohibited rather than protected speech - are the type of mere conclusory assertions prohibited by Brunette and Marcus.  There is no indication that Neff is himself an expert in child development specifically or even child pornography generally.[4]  In these circumstances, seizure of the Mr. Lewis's computer from his home was unlawful; consequently, the E-mac itself and the evidence later extracted from it must be suppressed.

IV.  DEFENDANT'S REQUEST TO SPEAK TO THE AGENTS AND SUBSEQUENT WRITTEN AND ORAL ADMISSIONS TO AGENTS ON FEBRUARY 16 AND MARCH 24, 2004 WERE THE DIRECT RESULT OF THE ILLEGAL SEIZURE OF DEFENDANT'S E-MAC COMPUTER AS WELL AS A RESULT OF THE PRIOR ILLEGALITIES.

Four days after the seizure of his E-mac computer, Mr. Lewis was again interviewed by agents.  During this interview and an interview one month later, Mr. Lewis made inculpatory admissions that he had viewed and downloaded child pornography onto both his new and old computer.  The statements followed in time and were the direct result of the illegal seizure of the Gateway computer, the illegal manual and expert searches of the Gateway, and the

---

[4]The later-obtained search warrant indicates only that Trooper Neff is a member of the Essex County Computer Crimes Unit.

agents' actions during the illegal seizure of the E-mac computer. Given the long, continuous, and pervasive nature of the <u>Fourth Amendment</u> violations over the course of the investigation, any admissions made by Mr. Lewis represent the "fruit of the poisonous tree" and must be suppressed. <u>Wong Sun</u>, <u>supra</u>.

V.    THE SEARCH WARRANT AUTHORIZING THE SEARCH OF THE E-MAC'S HARD DRIVE WAS COMPLETELY THE FRUIT OF THE PRIOR <u>ILLEGALITIES</u>.

On March 11, 2004, Agent Vazquez applied to Magistrate Judge Judith G. Dein for a Search Warrant authorizing agents to search for and seize child pornography from Mr. Lewis's E-mac computer. The warrant affidavit contained averments reaching back to the illegally seized Gateway computer, the illegal manual and expert searches of the Gateway, the limited admissions from Mr. Lewis first made by Mr. Lewis as a result of the seizure, Trooper Neff's observations during the illegal search, and Mr. Lewis's February 16, 2004 admissions subsequent to the illegal seizure of the E-mac. Because nearly all of the averments constituting probable cause that are contained in the affidavit describe evidence gathered in disregard of the <u>Fourth Amendment</u>, the search warrant itself is a "fruit of the poisonous tree" and any evidence obtained as a result of its execution must be suppressed.

VI.   THE SEARCH WARRANT WAS INVALID BECAUSE IT FAILED TO
      PARTICULARLY DESCRIBE THE PROCESS BY WHICH AGENTS WOULD
      CONDUCT THE FORENSIC EXAMINATION OF THE E-MAC COMPUTER.

      a.   The Warrant Was Invalid.

On March 11, 2004, Magistrate Dein issued a search warrant authorizing the examination of the E-mac hard drive, then in the custody of agents for almost a month, by a qualified computer specialist in a controlled laboratory setting.  Although the application suggested that the analysis "may entail several different techniques," nowhere did the application set forth the process by which the computer specialist would target and limit the search to evidence of violations of child pornography statutes.  The failure to specify the methods by which the specialist would be so limited resulted in the kind of general search prohibited by the Fourth Amendment.

The Fourth Amendment of the Constitution protects "against unreasonable searches and seizures" and requires that "no Warrants shall issue, but upon probable cause ... and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  As the Supreme Court has explained, "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another."  Marron v. United States, 275 U.S. 192, 196 (1927).

Forensic computer searches present special problems in limiting law enforcement to specific items to be seized. As the Tenth Circuit has explained in a line of cases, the problem is of intermingled documents: relevant information on the computer is so intermingled with irrelevant information that it is difficult for officers to determine which is which. United States v. Carey, 172 F.3d 1268, 1275 n.7 (10th Cir. 1999). In order to properly circumscribe the possibility that a narrow search will result in a broader, prohibited search,

> Law enforcement must engage in the intermediate step of sorting various types of documents and then only search the ones specified in a warrant. Where officers come across relevant documents so intermingled with irrelevant documents that they cannot feasibly be sorted at the site, the officers may seal or hold the documents pending approval by a magistrate of the conditions and limitations on a further search through the documents. The magistrate should then require officers to specify in a warrant which type of files are sought.

Id. at 1275 (emphasis supplied).

Here, although the affidavit explained the expansiveness of the search for "images of children engaging in sexually explicit conduct, as defined in 18 U.S.C. section 2256, and files and data related to the knowing receipt and/or possession, in interstate commerce, of such images," the affidavit utterly failed to describe the "conditions and limitations" of the search by describing the methods to target only those items sought. See United States v. Campos, 221 F.3d 1143, 1148 (10th Cir.

2000)(comparison of actual methods used by agents to search to those set forth in search warrant is relevant to determination of whether search was overbroad).  This is to prevent the specter of a general search prohibited by the <u>Fourth Amendment</u>: "officers conducting searches ... cannot simply conduct a sweeping, comprehensive search of a computer's hard drive," <u>United States v. Walser</u>, 275 F.3d 981, 986 (10th Cir. 2001).

Indeed, discovery has shown that the actual search and seizure, far from being limited to "images of children engaging in sexually explicit conduct," extended to protected written material (such as pornographic text stories) and other materials on Mr. Lewis's computer unrelated to images.  Such a search cannot be condoned under the <u>Fourth Amendment</u>.  <u>See</u> <u>Walser</u>, <u>supra</u>, 275 F.3d at 986 (law enforcement must employ search methodology to "conduct[] the search in a way that avoid[s] searching files of types not identified in the warrant").

The failure of the affidavit to follow the <u>Carey</u> procedure and circumscribe the search by including "conditions and limitations" of the search permitted the agents to conduct a general search and as such renders the warrant invalid.  For this reason, any evidence produced as a result of the forensic examination must be suppressed.

b.    The Good Faith Exception Does Not Apply.

The good faith exception applies if the search was conducted in objectively reasonable reliance on a defective warrant. It does not apply if "a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." United States v. Leon, 468 U.S. 897, 922 n.23 (1984). The good faith of both the officers who execute the warrant and those who obtain it or provide information for it is at issue. Id. at 922-23 n.24. Accordingly, the case agent is not free to draft a warrant that fails to adhere to firmly established legal principles and then defend the search based on the good faith of the computer specialist who executed it.

This is particularly true where, as here, the agents and forensic specialist involved were intimately familiar with the requirements of computer searches. Consequently, this is a case where the government faces a high burden to show good faith because of "the omission of a key ingredient, known to the law enforcement officers, leads to the subsequent invalidation of the warrant." United States v. Ricciardelli, 998 F.2d 8, 16-17 (1st Cir. 1993). The government cannot meet their burden here because, as in Ricciardelli, experienced agents presented an elaborate plan to search without apprising the magistrate of a significant fact: the search methodology to be employed. See Id. at 17; see also Fuccillo, 808 F.2d 173, 178 (1st Cir.

-25-

1987)(warning that, in applying for a warrant, agents must "take every step that could reasonably be expected of them").  In these circumstances, the agents cannot invoke the good faith exception. <u>Ricciardelli</u>, <u>supra</u>.

VII. THE FORENSIC SEARCH OF THE E-MAC WAS UNTIMELY BECAUSE THE SEARCH CONTINUED WELL BEYOND THE MARCH 31, 2004 EXPIRATION <u>DATE IN THE WARRANT</u>.

The search warrant issued by Magistrate Dein on March 11, 2004 specified that the agents were to search the computer by March 21, 2004, ten (10) days after the issuance of the warrant. Discovery reveals that while a "preliminary" analysis was performed by March 16, 2004, the substantial portion of the analysis was not begun until April 2004 and not completed until September 10, 2004, nearly six months after the expiration of the search warrant.

"A search warrant must be executed and returned to the judge . . .  Who issues it within [the time frame specified in the warrant; after the expiration of this time the warrant, unless executed, is void." <u>Sgro v. United States</u>, 287 U.S. 206, 210 (1932).  "If the police were allowed to execute [a] warrant at leisure, the safeguard of judicial control over the search which the <u>Fourth</u> <u>Amendment</u> is intended to accomplish would be eviscerated.  Thus, a search pursuant to a stale warrant is invalid." <u>United States v. Bedford</u>, 519 F.2d 650, 655 (3rd Cir. 1975).

In <u>United States v. Brunette</u>, 76 F.Supp.2d 30 (D.Me. 1999), Judge Carter suppressed evidence obtained as a result of forensic review that took place beyond the time specified in the search. <u>Id.</u> at 42.  This was true even where the government asked for an extension of time in which to conduct the analysis.  <u>Id.</u>  Relying on <u>Sgro</u>, <u>supra</u>, and <u>Bedford</u>, <u>supra</u>, Judge Carter ruled that because there was "no legitimate reason for [the government's] delay" its failure to "adhere to the requirements of the search warrant" and "any evidence gathered" as a result of the forensic search had to be suppressed.   <u>Id.</u>

As in <u>Brunette</u>, the government failed to adhere to the requirements of the search warrant by completing the forensic analysis before the specified date.  Unlike <u>Brunette</u>, the government here did not even make a minimal effort to comply by requesting additional time in which to conduct its search.  Consequently, the evidence gathered as a result of any forensic search conducted and completed after March 21, 2005 must be suppressed.

<u>REQUEST FOR EVIDENTIARY HEARING</u>

Defendant requests an evidentiary hearing on this motion.

                    ANDREW LEWIS
                    By His Attorney,

                    /s/ Timothy G. Watkins
                    Timothy Watkins
                    B.B.O. #567992
                    Federal Defender Office
                    408 Atlantic Ave., 3rd Floor
                    Boston, MA  02110
                    Tel: 617-223-8061