# EXHIBIT
# C

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | CRIMINAL NO. 04-10317-RCL |
| ) | |
| ANDREW LEWIS | |

### AFFIDAVIT OF ANDREW LEWIS

I, Andrew Lewis, do hereby depose and state the following:

1. My name is Andrew Lewis. I am the defendant in this case.

2. In early February, 2003, I was an employee of the National Park Service assigned to the Salem Maritime National Historic Site ("SAMA").

**GATEWAY PERSONAL COMPUTER**

3. On or around the end of January, 2003, I brought a Gateway personal computer to my work with the intention of substituting it for my government-issued computer. After bringing my personal computer to work, I was told I could not do this. Consequently, I set the computer aside in a box with a note on top to alert people that it was my personal property.

**FEBRUARY 7, 2003 INTERROGATION**

4. On February 7, 2003 I came into work at about 8:30 a.m. to begin my 8:45 a.m. shift. When I arrived there, I saw

Michael Parr, my supervisor, along with Van Neill

whom I knew to be a Special Agent, and another agent. I had worked previously with Van Neill when we both worked at the Statue of Liberty park in New York City.

5. I did not feel that I could refuse to talk to Van Neill because were both employed by the National Park Service, my immediate supervisor, Michael Parr, was present in the area, and Van Neill was asking about work-related matters. I believed that failure to cooperate with Van Neill would result in significant consequences to my job, up to and including termination.

6. Van Neill told me that the government had found and seized a computer that had been found in the basement. I told them it was my personal computer, and explained to Van Neill how my personal computer had come to be at the site.

7. Van Neill told me that it had inappropriate images on it. I asked him how he had gotten into my personal property (my computer) and he told me that it was none of my business.

8. I also explained to him that I did not use my government-supplied work computer to visit or download pornography or other inappropriate material.

9. He told me that he was going to check my government computer, too. He told me that I was on administrative

2

me to go home.

10. Shortly after that interrogation, I resigned my commission and requested that I be reassigned as an interpretation ranger, a safety officer, or anything else other than law enforcement.

11. About thirty (30) days later, in March, 2003, I received a letter telling me that the criminal investigation had been concluded, and that I was to return to work. I had not previously understood that there had been a criminal investigation. The letter suggested that there might be administrative action taken in the future.

**JUNE 27, 2003 INTERROGATION**

12. On June 27, 2003 I was again working at the SAMA site as an interpretative ranger. I was told to go over to one of the administration buildings to meet with Van Neill and another agent.

13. When I arrived there, Van Neill told me that he had to talk to me. I believed that this was in regard to the administrative action that the letter had mentioned.

14. I did not feel that I could refuse to talk to Van Neill because he had already demonstrated that he had the power to have me suspended. Consequently, I again believed that

3

significant consequences to my job, up to and including termination.

15. Van Neill reviewed the Department of Interior policies on internet and computer use. I again told him that I had not used any government computer to view or download pornography.

16. Van Neill instructed me that there was no right to privacy in U.S. Government computers and that they would look to see what was on any computer I used.

17. He also continued to question me about the Gateway computer that I had brought from home. I again told him that it was personal property that I had brought from home, and considered it personal property even at work and that was why I had put the note on it. He told me that it didn't matter whether I considered it personal property, that they had already seized and looked through it, and that they wanted to continue to search it. He asked for my consent to this search. I believed that my consent was just a formality as he already had taken the computer and looked through it, and he had already told me that there was no right to privacy in work computers.

4

agent for the next eight (8) months.

## FEBRUARY 12, 2004 INTERROGATION

19. On February 12, 2004, I was still working at the SAMA site as an interpretative ranger. I was told to go over to the protection office located in one of the administration buildings to again meet with Van Neill. Because I no longer worked as a Law Enforcement Park Ranger, I had no desk or office there.

20. The protection office is small and contains three desks. When I arrived, Van Neill and another agent were there.

21. There is only one door into and out of the protection office. Van Neill seated me farthest away from door with him and the other agent between me and the door.

22. Van Neill me that he wanted to look at my home computer and asked me if I would consent. He then introduced the other agent as a Massachusetts State Trooper and told me he was there because he knew about Macintosh computers and would help with the search. (I had, in a previous interview, told Van Neill that my new home computer was a Macintosh.)

23. I did not feel that I could refuse to talk to Van Neill because he had already demonstrated that he had the power to have me suspended. Although he was asking me about my home

5

and had the authority to allow me to go home during my shift, which was otherwise forbidden - indicated to me that his activities were work related. Consequently, I again believed that failure to cooperate with Van Neill would result in significant consequences to my job, up to and including termination.

24. After some further questioning and discussion, Van Neill and the trooper drove me to my home in a government Ford Explorer. Van Neill was driving and the trooper was in the rear. I was very scared and nervous during ride and believed that only by allowing them to go in my home would I be left alone and allowed to go back to my job to finish working.

25. I let the men into my apartment. The Trooper immediately went over and turned on my computer. At the same time, Van Neill engaged me in small talk in another room.

26. After about 10-15 minutes, the Trooper announced "I've got child pornography on this, I'm seizing this computer." Van Neill, after conferring with the Trooper, announced that he was seizing the computer and directed me to go downstairs.

27. Van Neill carried the computer down to the Explorer and put it in the backseat. He told me that he was going to have me

28. They took me back to work. I went and finished my shift.

Signed under pains and penalties of perjury this __12__ day of September, 2005.

_____
Andrew Lewis